**Aljoe POINDEXTER, Appellant,**

**v.**

**FEDERAL BUREAU OF INVESTIGATION.**

No. 83-1151.

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1984.

Decided June 26, 1984.

As Amended June 26, 1984.

Scalia, Circuit Judge, concurred in part and dissented in part with opinion.

Aljoe Poindexter was on the brief, pro se.

Susan Siegal, Washington, D.C., with whom Steven H. Goldblatt, Washington, D.C., appointed by this Court, and Norman A. Townsend, Alexandria, Va., were on the brief as amicus curiae urging remand to the District Court for a new trial.

Diane M. Kozub, South Orange, N.J., of the Bar of the Supreme Court of New Jersey, pro hac vice by special leave of the Court, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before EDWARDS and SCALIA, Circuit Judges, and SWYGERT,* Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Opinion concurring in part and dissenting in part filed by Circuit Judge SCALIA.

HARRY T. EDWARDS, Circuit Judge:

This appeal arises from a judgment of the District Court in favor of the defendant in an employment discrimination action brought and prosecuted *pro se* by appellant Aljoe Poindexter. The appellant's argu-

ment for reversal has been supplemented by the briefing and oral argument of counsel from the Appellate Litigation Clinic of Georgetown University Law Center, appearing as *amicus curiae* on appeal. The appellant and *amicus curiae* argue that the District Court erred in failing to grant the appellant's request for appointment of counsel. Because we cannot discern from this record whether counsel should have been appointed for the appellant we reverse and remand for further proceedings.

BACKGROUND

The appellant, a Black male, was hired by the appellee, the Federal Bureau of Investigation ("FBI"), in 1974. On February 27, 1977, he was promoted to a GS–6 position as a coding clerk or "reader" in the Automation and Research Section, Identification Division of the FBI. His primary responsibility in this position was to review reports coded by other personnel to insure their accuracy.

The undisputed facts indicate that the appellant's work record in the Automation and Research Section was at best adequate. In each of four annual evaluations between October 1976 and September 1980, the appellant's performance was rated "satisfactory." Joint Stipulation of Material Facts No Longer in Dispute ("Joint Stipulation") at 1–3, *reprinted in Amicus Curiae* Appendix ("App."), at 74–76. During this period, the appellant received a number of "unsatisfactory" monthly ratings and was censured on two occasions for having an excessive number of such ratings during a twelve-month period. *Id.*[1]

On February 27, 1980, the appellant filed a formal Equal Employment Opportunity complaint with the Department of Justice, alleging that the FBI discriminated against Black GS–6 coding clerks in assignments and promotions. The record does not indicate the disposition of this complaint.[2]

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. The appellant was censured a third time on April 23, 1981. Joint Stipulation at 3, App. 76.

2. It is worth noting that the undisputed facts and the trial court's findings suggest that the appellant's chance of prevailing on this issue was remote. The trial court found that a strong work record was required for promotion or

The undisputed facts also indicate that during his six years of employment with the FBI prior to the filing of his administrative complaint, the appellant had never been absent without leave or suspended. Joint Stipulation at 4, App. 77. However, on April 14, 1980—less than two months after filing the administrative complaint—he was charged with fifteen minutes of unauthorized absence without leave ("AWOL") on April 9 for being in the appellee's cafeteria when he was due at his work station. *Id.* at 2, App. 75. On September 26, 1980, the appellant was charged with 30 minutes AWOL on September 12, 1980 for leaving work early. *Id.* On January 22, 1981, the appellant was "censured, placed on probation for 60 days, and suspended for three days pursuant to his third AWOL within a twelve-month period." *Id.* at 3, App. 76.

The appellant filed a second administrative complaint on February 6, 1981, alleging acts of reprisal by the FBI following the filing of the first complaint. The administrative disposition of this claim also does not appear in the record.

On May 1, 1981, the appellant filed a complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e–17 (1976 & Supp. V 1981), charging the FBI with race and sex discrimination in making promotions, and acts of reprisal and harassment. On May 29, 1981, the Department of Justice notified the appellant of his right to apply for appointment of counsel pursuant to 42 U.S.C. § 2000e–5(f)(1) (1976). The appellant apparently made this application in an unfiled letter to the court dated July 28, 1981.[3]

As the only significant issue on appeal concerns the trial court's treatment of the appellant's motion for appointment of counsel, we will discuss the facts relevant to this issue at some length. In doing so, we are constrained by the incompleteness of the record. Although there is some indication that at one point the trial court did attempt to appoint counsel for the appellant,[4] the record does not indicate the basis for this appointment or even whether the appointment preceded or followed the appellant's motion.[5]

The earliest transcribed record of the District Court proceeding is a September 17, 1981 status call. According to this record, the attorney "originally appointed" by the court had, at the time of his appointment, indicated his unwillingness to represent the appellant. Transcript of September 17, 1981 Status Call at 3 (Sept. 17, 1981), *reprinted in* App. 25. Following this attorney's withdrawal, the trial judge apparently attempted to find a new attorney to represent the appellant. These efforts were unsuccessful because several attorneys who had been contacted "indicated that they could not take a case without doing great hardship to their present schedules." *Id.* at 5, App. 27.

---

rotation and that the appellant's work record was inferior to those of the employees who were promoted or rotated during the relevant period. *Poindexter v. FBI*, No. 81–1038, mem. op. at 4–5 (D.D.C. Nov. 24, 1982), *reprinted in* App. 66–67.

**3.** Although this letter does not appear in the record, the appellant referred to the letter when he later reiterated his request for appointment of counsel. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction at 2 (Sept. 16, 1981), *reprinted in* App. 89. *See* Appellee's brief, pp. 9–10 ("The record indicates that appellant, by letter of July 28, 1983, apparently requested the assistance of the District Court in the appointment of counsel.") (citation omitted). The court's efforts to secure counsel for the appellant also suggest that such a request was made.

**4.** *See* Transcript of September 17, 1981 Status Call at 2–3 (Sept. 17, 1981) (discussion of counsel "originally appointed" by court), *reprinted in* App. 24–25.

**5.** As we have explained, the appellant moved for appointment on July 28, 1981. The court's docket sheet indicates that a hearing was held on July 17, 1981, and includes the following notation: "Motion for preliminary injunction will be set after Pltf. advises whether he will secure counsel or will proceed pro se." App. 6. As the docket sheet reveals no other proceedings until September 17, 1981, the most reasonable inference is that counsel was appointed and withdrew on July 17, and the appellant thereafter moved for appointment of counsel.

The District Court judge then arranged the September 17 status call, and informed the appellant: "I have been unable to find anyone to represent you, and I wanted to call you in together with [the appellee's attorney] ... to suggest to you several routes." *Id.* at 3, App. 25. The court first suggested clinical programs and legal services, and then described options available if the appellant believed he could pay for counsel. *Id.* The following exchange then occurred:

THE COURT: I have asked several attorneys that I know who handle EEO cases, and all of them have indicated to me that their schedules or calendars are such that they cannot take on another case. So that's where I stand in my efforts to try to find someone to represent you.

So I will be happy to hear anything you might wish to suggest.

Do you believe that you can afford to pay counsel?

MR. POINDEXTER: I think I could manage, providing I can keep my job.

THE COURT: Well, of course, that's something the court cannot control.

MR. POINDEXTER: Oh, I see.

THE COURT: You see, I can't control that. Certainly not today I can't control it. You apparently indicated to one of my clerks that you have attempted to get counsel too, but have been unsuccessful.

MR. POINDEXTER: Right.

THE COURT: Would you mind—you don't have to—but would you mind stating why you have been unable to? Has it been financial?

MR. POINDEXTER: No, Ma'am.

THE COURT: It has not been financial?

MR. POINDEXTER: No. I have had, including the attorney that was here last time we was here, he is the third, the one to refuse materials I have, and said he didn't want to mess with it.

*Id.* at 4–5, App. 26–27. Following this discussion, the court outlined at great length the steps the appellant might take to secure counsel. At the conclusion of the status call the District Court judge explained to the appellant:

... I have, as I said, done my very best, and those lawyers that you know have all said that their schedules just don't permit, just won't permit.

This is the type of case that requires a lot of work, and a lot of time, and concentrated effort, and I can understand if an attorney says, "well, my calendar is just too full for me to take something at this time."

That's what has happened in this regard ....

... At any rate, those are the only things I can suggest to you at this time, Mr. Poindexter, and I hope you will be successful.

*Id.* at 12–13, App. 34–35.

The appellant did tell the court that he could afford counsel, *but only providing that he could keep his job.* This qualification is significant because, at the time of the September 17 hearing, there was substantial reason to believe that the appellant's future in his job was precarious. In a motion two months earlier to enjoin the appellee from taking administrative action against him, the appellant warned the court that he was being subjected to acts of reprisal and claimed that recent events suggested that he might be dismissed. Plaintiff's Motion For Temporary Restraining Order and Preliminary Injunction (July 8, 1981). In a motion submitted the day before the September 17 status call, the appellant informed the court that he was in the process of being dismissed. Plaintiff's Motion For Temporary Restraining Order and Preliminary Injunction at 2 (Sept. 16, 1981), *reprinted in* App. 89. This latter motion was discussed at the September 17 status call, at which time the appellee's counsel told the court that "the agency has recommended that [the appellant] be dismissed." Transcript of September 17, 1981 Status Call at 8 (Sept. 17, 1981), *reprinted in* App. 30. After the appellee added that "he is not about to be dismissed imminently," *id.*, the court scheduled a hearing on the motion for September 24.

On September 21, the appellee filed a brief opposing the appellant's motion for equitable relief. This brief again informed the court that the appellee had recommended the appellant's dismissal and that the appellant already had been suspended for ten days. It also stated that, on September 14, "plaintiff was presented with a letter from the agency advising him that strong consideration was being given to dismissing him." Defendant's Opposition to Plaintiff's Motion For Temporary Restraining Order and Preliminary Injunction at 2 (Sept. 21, 1981).

The September 24 hearing was cancelled at the appellant's request so that he could continue to search for an attorney. Transcript of November 20, 1981 Status Call at 2 (Nov. 20, 1981), *reprinted in* App. 38. On that same day, the appellant was dismissed from his job. The record does not indicate that the court was informed of the appellant's dismissal at that time, or that the appellant reiterated his request for appointment of an attorney.

The parties returned to the court for a status call on November 20, 1981. At this proceeding, the appellant informed the court:

> I am still in process of looking [for an attorney]. I have met with Mr. David Lang's assistant on several occasions, and he and I have been in the process of contacting quite a few people. But it has been to no avail, and I was dismissed on the 24th of September.
>
> And most attorneys are hesitant about taking on a client that is not employed, so I have applied for my unemployment. And I also applied for my retirement fund, and it will be eight weeks today, and I haven't received any unemployment.
>
> . . . .
>
> . . . So my hands have just more or less been tied as far as trying to come up with an attorney.

*Id.* at 2–3, App. 38–39. The ensuing discussion focused on what the next step in the litigation should be. After determining that the plaintiff's motion for equitable relief had been mooted by the dismissal but that the remaining claims were still actionable, the court told the plaintiff that "the only problem is, Mr. Poindexter, we have just got to move forward. Are you willing to move forward on your own?" *Id.* at 4–5, App. 40–41. The appellant replied: "I certainly am. It seems like that's the only thing I can do, is move forward on my own." *Id.* at 5, App. 41. The court then instructed that discovery should commence and could continue until February 1, 1982.

The record indicates little about the period from November 20, 1981 through January 5, 1982. It appears that no discovery was undertaken and it is clear that the appellant did not secure counsel. In subsequent filings and proceedings the appellant claimed that he was unemployed and could not even afford to take a deposition. Transcript of March 2, 1982 Status Call at 2, 5 (March 2, 1982), *reprinted in* App. 46, 49; Plaintiff's Motion For Enlargement of Time in Which to Conduct Discovery (Feb. 10, 1982).[6]

On January 5, the appellant received 13 unemployment compensation checks for the amount of $196 each. App. 129. He consulted an attorney three days later, and on January 20, 1982 signed a fee agreement with her. The appellant agreed to pay a $1300 retainer, and, pursuant to that agreement, paid a first installment of $800. App. 130–32 (copy of fee agreement). One week later, the attorney returned the retainer and withdrew her representation allegedly because she had insufficient time to prepare for discovery. Transcript of March 2, 1982 Status Call at 4 (statement of Aljoe Poindexter), App. 48.

Finding himself once again without counsel, the appellant moved for an extension of time for discovery. After this motion was denied, the appellant repeated the motion

---

**6.** The record does reveal that the appellant spent $232 for an airplane ticket on December 6, 1981, *see* App. 133 (copy of cancelled check), apparently to travel to his hometown. *See* Transcript of March 2, 1982 Status Call at 2, App. 46.

on February 10, 1982. The appellant reminded the court that he had been unemployed when discovery commenced and that the receipt of his unemployment compensation checks had been delayed. He concluded that he had "found it virtually impossible to conduct Discovery from November 20, 1981 to January 6, 1982 because of financial reasons and a trip to his hometown." Plaintiff's Motion For Enlargement of Time in Which to Conduct Discovery at 2 (Feb. 10, 1982).

The appellant's motion was considered at a status call on March 2, 1982. After the plaintiff explained his financial problems and the court made inquiries about proposed discovery, the following discussion occurred:

THE COURT: Now let me say something to you very clearly, Mr. Poindexter, about depositions. I don't think any depositions will be as inexpensive as $150. All right?

MR. POINDEXTER: Well, I am prepared.

THE COURT: Well, you know, you came in here with that statement, and I just wanted you to know that I think that's an unreasonable estimate for deposition. It is very likely ... that each deposition could run anywhere from $300 up. I just want you to understand that. All right.

Transcript of March 2, 1982 Status Call at 9–10, App. 53–54. The court then granted the motion for an extension of discovery.

During the discovery period that followed this status call, and at trial, the appellant pursued his claims without counsel. The case was tried from the bench, with the District Court judge ultimately entering judgment in favor of the appellee. The court held that the appellee's decision not to promote or reassign the appellant was explained by the appellant's inadequate job performance, and indicated that race was not a factor in this decision. *Po-*

*indexter,* No. 81–1038, mem. op. at 9, *reprinted in* App. 71. The court also concluded that the appellant had failed to prove reprisal by a preponderance of the evidence. *Id.* The appellant now seeks review of this judgment.

## DISCUSSION

■ The appellant's argument on appeal is that the lower court erred in failing to appoint counsel pursuant to 42 U.S.C. § 2000e–5(f)(1) (1976).[7] The relevant language in this provision is as follows:

Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security.

*Id.* While the provision gives plaintiffs a right to request representation, *Hilliard v. Volcker,* 659 F.2d 1125, 1129 & n. 26 (D.C. Cir.1981), it does not create a statutory right to have counsel actually appointed. *E.g., Jenkins v. Chemical Bank,* 721 F.2d 876, 879 (2d Cir.1983). The decision to appoint rests in the sound discretion of the trial judge. *E.g., id.; Ivey v. Board of Regents,* 673 F.2d 266, 269 (9th Cir.1982); *Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305, 1308 (5th Cir.1977).

The statute's stipulation that requests for appointment be granted "in such circumstances as the court may deem just" offers little direction to lower courts confronted with such requests. Many of our sister Circuits have attempted to fill this void by articulating standards to guide lower courts in the exercise of their discretion. *E.g., Jenkins,* 721 F.2d at 880; *Bradshaw v. Zoological Society,* 662 F.2d 1301, 1318 (9th Cir.1981); *Caston,* 556 F.2d at 1309–10; *cf. Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 at 1004 (8th Cir. 1984) (articulating test for appointment under 28 U.S.C. § 1915(d) (1982) in a Title VII

---

7. The appellant also points to a number of relatively minor inconsistencies in the appellee's evidence at trial, and argues that this justifies reversal. After reexamining the District Court's findings with some care, we conclude that the

appellant's challenges fall far short of that required for reversal on this ground. *See generally Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1787, 72 L.Ed.2d 66 (1982).

case). In so doing, these courts have paid heed to the Supreme Court's instruction that "such discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (quoting *United States v. Burr,* 25 F.Cas. 30, 35 (C.C.D.Va.1807) (No. 14,692) (Marshall, C.J.)). Such efforts to insure that requests for appointment are resolved in a principled and consistent manner are particularly essential in cases of the sort before us, for "[t]he decision to deny the assistance of an appointed attorney to a layman unschooled in the law in an area as complicated as the civil rights field"[8] frequently leaves the plaintiff with little hope of successfully prosecuting a claim.[9]

This court has not heretofore stated the test for adjudicating requests for appointment of counsel.[10] We do so here because it is necessary for the disposition of this case, and to eliminate uncertainties concerning the law of this Circuit. Our analysis begins with a discussion of the assumptions and goals that underlay Congress'

passage of the attorney appointment provision. This discussion both informs our ensuing delineation of the standards governing requests for appointment and offers general guidance to trial courts exercising the substantial discretion afforded by the statute. We then explain the approach that should be followed in acting on requests for appointment and indicate the range of a trial court's discretion. In identifying the applicable standards, we have been guided both by the structure and history of Title VII (and the appointment provision in particular), and by the substantial body of case law discussing requests for appointment of counsel.[11] Next, we apply this approach to the case before us and conclude that this case should be remanded for further consideration by the District Court. Finally, because of the unique posture of this litigation, we delineate the procedures that are to be followed by the court on remand.

### A.

Although courts have acted on requests for appointment of counsel in numerous Title VII cases, they often have done so

**8.** *Caston,* 556 F.2d at 1308 (holding that a trial court's decision on appointment is immediately appealable).

**9.** *E.g., id.* at 1309 ("The refusal to appoint counsel may in some circumstances effectively deny a potential plaintiff his only remedy under the law."). *See Merritt v. Faulkner,* 697 F.2d 761, 763 (7th Cir.1983) ("In some civil cases meaningful access [to the federal courts] requires representation by a lawyer") (discussing 28 U.S.C. § 1915(d) (1982)), *cert. denied,* — U.S. ——, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

**10.** In *Hilliard v. Volcker,* 659 F.2d 1125 (D.C.Cir. 1981), we did not articulate standards to govern requests for appointment of counsel, leaving this matter "to the informed discretion of the District Court in the first instance." *Id.* at 1133 n. 76. Because the case before us has demonstrated the necessity of delineating principles to guide district courts in the exercise of their discretion, we have undertaken to do so.

**11.** In many instances, the legislative considerations and the consensus in the case law point to the same conclusion, either with respect to the range of the court's discretion or the signifi-

cance of a particular factor. When this is the case, we have articulated the principle that lower courts should follow. There are also instances in which the appropriate principle is less clear; when this is the case, we have left the trial court correspondingly greater discretion. In prescribing the parameters of the trial court's discretion in this manner, we are in agreement with the general view of the Third Circuit:

> When circumstances are either so variable or so new that it is not yet advisable to frame a binding rule of law, trial courts may be given discretion until the factors important to a decision and the weight to be accorded them emerge from the montage of fact patterns which arise. Often, in time, the contours of a guiding rule or even principle may develop as the courts begin to identify the policies which should control. Thus, for example, although the selection of an appropriate remedy has been generally deemed to lie in the equitable discretion of the trial judge, after experience has accumulated the appellate courts may decide that a specific remedy should be awarded as a general rule.

*United States v. Criden,* 648 F.2d 814, 818 (3d Cir.1981) (citation omitted). *See also* Friendly, *Indiscretion About Discretion,* 31 EMORY L.REV. 747, 771–73 (1982).

with surprisingly little discussion of the congressional judgments that underlie the attorney appointment provision. Some of these cases appear to indulge in speculation regarding the utility of judicial appointment of attorneys, almost without regard to congressional preferences on the subject. Thus, several district court opinions may be found to suggest that if plaintiffs cannot secure representation, at least on a contingency fee basis, their claims most likely border on the frivolous.[12] To adherents of this view, the private bar plays an essential role in filtering out meritless cases, and courts would be wise not to override this function by appointing counsel where none can otherwise be secured.[13] An alternative view reflected in the case law is that the discretion of the private bar is not an entirely satisfactory means to decide which cases merit the attention of the judiciary.[14] These decisions have recognized that, because it is often difficult to prove discrimination,[15] and because financial risks will be incurred by attorneys representing indigent clients, one cannot assume that only meritless cases will be filtered out.[16] Advocates of this second view might conclude that judicial appointment of attorneys in some cases is essential because of both the individual's and society's interest in vindicating the right to pursue a livelihood free from discrimination.

We need not express an opinion as to which of these descriptions better comports with reality, or reflects wiser social policy, for our choice has been dictated by Congress. In the words of the Fifth Circuit: "The clear thrust of the appointment power was to enlist the aid of the district courts in

12. *In re Nine Applications For Appointment of Counsel,* 475 F.Supp. 87, 91 (N.D.Ala.1979) ("Title VII actions draw representation where there is any color of merit to be found in the claim."), *vacated sub nom. White v. United States Pipe & Foundry Co.,* 646 F.2d 203 (5th Cir.1981); *McIntyre v. Michelin Tire Corp.,* 464 F.Supp. 1005, 1010 (D.S.C.1978) (since Title VII authorizes attorney fee awards, "it appears logical that if the plaintiff's claim has merit she will be able to obtain counsel on a contingency fee basis").

13. *In re Nine Applications For Appointment of Counsel,* 475 F.Supp. at 91 ("the attorney traditionally is trained to assess the cases as they are brought to him. Before actions are filed, the attorney should dissuade frivolous litigrants.... This is not the role for the judge ...."), *vacated sub nom. White v. United States Pipe & Foundry Co.,* 646 F.2d 203 (5th Cir.1981); *In re Mahone,* 333 F.Supp. 259, 260 (E.D.Tenn.1971) (rejecting the EEOC's argument that "the possibility of substantial recovery has not produced private attorneys willing to assist in this type of litigation," and reasoning that "the Commission appears to forget that the local bar may also supplement its efforts in screening out complaints where the grievances are more imagined than real, preventing patently frivolous litigation"). *But cf. EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 601, 101 S.Ct. 817, 824, 66 L.Ed.2d 762 (1981) (observing that an "employee has little to gain from filing a futile lawsuit, and indeed faces the possibility of an adverse fee award if the suit is frivolous"). For an explication of this view in a different context, see *McKeever v. Israel,* 689 F.2d 1315, 1325 (7th Cir.1982) (Posner, J., dissenting) ("Encouraging the use of retained counsel thus provides a market test of

the merits of the prisoner's claim. If it is a meritorious claim there will be money in it for a lawyer; if it is not it ought not to be forced on some hapless unpaid lawyer.") (28 U.S.C. § 1915(d) (1982)).

14. *See, e.g., Merritt v. Faulkner,* 697 F.2d 761, 768–69 (7th Cir.1983) (Cudahy, J., concurring) (discussing 28 U.S.C. § 1915(d) (1982) and the imperfections of the legal marketplace with respect to prison litigation), *cert. denied,* —— U.S. ——, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305, 1309 (5th Cir.1977) ("in some areas, either because of unpopularity or unfamiliarity, a particular plaintiff may be unable to locate an attorney who is willing to prosecute even a meritorious claim").

15. *See, e.g., Petete v. Consolidated Freightways,* 313 F.Supp. 1271, 1272 (N.D.Tex.1970) ("Further complicating plaintiff's problem has been the reluctance of the attorneys she has approached to undertake the specific and complex challenges of a Title VII lawsuit which are not common to more frequently litigated areas of the law.").

16. *See, e.g., Edmonds v. E.I. duPont deNemours & Co.,* 315 F.Supp. 523, 524 (D.Kan.1970) (although "plaintiff's claim was not lacking in merit," plaintiff "had undertaken to get several different attorneys in Douglas County, Kansas, the place of her residence, to represent her but all had declined because they had no understanding of the legal problems involved and would not undertake a study of the case without substantial retainer which plaintiff was financially unable to pay").

finding lawyers who would take such cases...." *White v. United States Pipe & Foundry Co.*, 646 F.2d 203, 206 (5th Cir. 1981). Indeed, the very fact that the appointment provision was passed reveals that Congress intended courts to play a role in securing counsel for Title VII claimants. As the Ninth Circuit has observed:

> The only plausible reason for enactment of the provision was Congress' recognition that some civil rights claimants with meritorious cases would be unable to obtain counsel. The district court's reasoning would render the statutory provision for appointment of counsel nugatory; the provision for appointment of counsel would be wholly unnecessary if all meritorious claims attracted retained counsel.

*Bradshaw v. Zoological Society*, 662 F.2d 1301, 1319 (9th Cir.1981).[17] Congress' belief in the utility of judicial appointment of counsel in Title VII cases is further evidenced by its specific inclusion of such authorization in the Civil Rights Act, when Congress could simply have left plaintiffs to rely on the authority created by 28 U.S.C. § 1915(d) (1982).[18] *Jenkins v. Chemical Bank*, 721 F.2d 876, 879 (2d Cir. 1983) ("Viewed against the background of the general authorization to courts to request counsel to represent civil litigants, 28 U.S.C. § 1915(d) (1982), [the attorney appointment provision in the Civil Rights Act of 1964] suggests a special congressional concern with legal representation in Title VII cases.") (footnote omitted); *Flowers v. Turbine Support Division*, 507 F.2d 1242, 1244 n. 2 (5th Cir.1975) ("It may be

that the federal courts should not be so parsimonous in Title VII suits since Congress, apparently anticipating a special need, has specifically provided that a court may appoint an attorney in these cases ....").

The legislative history of the Civil Rights Act also unmistakably evidences "[c]ongressional recognition of the importance of the appointment of counsel provision." *Bradshaw*, 662 F.2d at 1316. "The provision ... has been a part of Title VII from the time of its enactment." *Hilliard v. Volcker*, 659 F.2d 1125, 1128 n. 24 (D.C.Cir. 1981). Senator Humphrey explained that the provision was necessary "[s]ince it is recognized that the maintenance of a suit may impose a great burden on a poor individual complainant." 110 CONG.REC. 12,722 (1964). The Senate soundly rejected an amendment to the proposed Act that would have deleted the courts' authority to appoint attorneys in employment discrimination suits, 110 CONG.REC. 14,196 (1964), and an amendment that would have specified that a court could not appoint an attorney without the consent of the attorney. 110 CONG.REC. 14,201 (1964).

Congress' belief in the importance of attorney appointment in appropriate cases is also apparent in the legislative history of the Equal Employment Opportunity Act of 1972. Although "Congress amended 42 U.S.C. § 2000e–5 extensively, [it] retained the appointment provision in its original language." *Hilliard*, 659 F.2d at 1128 n. 24. The House Report observed:

---

**17.** *Accord White*, 646 F.2d at 206–07 n. 7 ("The district court's seeming assumption ... that meritorious claims will never need the benefit of [appointed counsel] is completely at odds with Congress' implicit assumption to the contrary.") (discussing involuntary appointment) (citation omitted).

**18.** 28 U.S.C. § 1915(d) (1982) provides:
> The court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.

In considering requests for appointment by Title VII claimants the overwhelming majority of courts have focused on Title VII's specific provi-

sion for court appointment, 42 U.S.C. § 2000e–5(f)(1) (1976), rather than the more general provision in 28 U.S.C. § 1915(d). *See, e.g., Norpel v. Iowa Highway Patrol,* 4 Fair Empl.Prac. Cas. (BNA) 391 (N.D.Iowa 1971). *But see Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 (8th Cir.1984) (focusing on 28 U.S.C. § 1915(d) without explaining why 42 U.S.C. § 2000e–5(f)(1) was not controlling). Section 2000e–5(f)(1) is generally viewed as imposing a lesser burden on plaintiffs seeking appointment of counsel, both because of the specificity of Congress' action, *see* text accompanying note 18, and because this provision does not require that the plaintiff be a pauper. *See* note 29, *infra.*

By including this provision in the bill, the committee emphasizes that the nature of Title VII actions more often than not pits parties of unequal strength and resources against each other. The complainant, who is usually a member of a disadvantaged class, is opposed by an employer who not infrequently is one of the nation's major producers, and who has at his disposal a vast array of resources and legal talent.

H.R.REP. No. 238, 92d Cong., 1st Sess. 12 (1971), U.S.Code Cong. & Admin.News 1972, 2137, 2148. The Senate's debate reflects a similar view. After an amendment denying the EEOC the authority to issue cease-and-desist orders inadvertently removed federal employees from the scope of the attorney appointment provision, an amendment remedying this omission was passed in the Senate by a voice vote. 118 CONG.REC. 956 (1972). In arguing that the attorney appointment provision should cover federal employees, Senator Javits emphasized that this

> is a very important right for the individual ... for the individuals involved are not, in the main, high salaried, in that those who would be likely to sue in these equal employment opportunity cases are fairly modest people.
>
> . . . .
>
> ... If the complainant is going to have nothing but a remedy in court, at least let us lock that up in the best way we can....

118 CONG.REC. 954–55 (1972) (statement of Sen. Javits).

■ It is thus clear that Title VII's provision for attorney appointment was not included simply as an afterthought; it is an important part of Title VII's remedial scheme, and therefore courts have an obligation to consider requests for appoint-

ment with care. In acting on such requests, courts must remain mindful that appointment of an attorney may be essential for a plaintiff to fulfill "the role of 'a private attorney general,' vindicating a policy 'of the highest priority.'" *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 63, 100 S.Ct. 2024, 2030, 64 L.Ed.2d 723 (1980). *See also EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 602, 101 S.Ct. 817, 824, 66 L.Ed.2d 762 (1981) (private right of action is "important part of Title VII's scheme of enforcement"); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978) (plaintiff is "the chosen instrument of Congress" to remedy employment discrimination); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 45, 94 S.Ct. 1011, 1018, 39 L.Ed.2d 147 (1974) (same); *Miller v. Staats*, 706 F.2d 336, 340 (D.C.Cir.1983) (same). *See generally Coles v. Penny*, 531 F.2d 609, 615 (D.C.Cir.1976) ("Title VII is remedial in character and should be liberally construed to achieve its purposes").

■ At the same time, it does not appear that Congress sought to ensure appointment of counsel as a matter of course. To the contrary, the statutory language expressly leaves this decision to the discretion of the trial court. Moreover, the legislative history clearly indicates that Congress' overriding concerns were the hardship that litigation costs would impose on indigent plaintiffs and the need to minimize the impact of resource imbalances between plaintiffs and defendants on the outcome of Title VII litigation.[19] These concerns are, of course, implicated most seriously when a plaintiff cannot afford to hire counsel. For if plaintiffs are capable of securing counsel on their own, they can accomplish the end sought by judicial appointment of counsel

---

**19.** See *Hilliard v. Volcker*, 659 F.2d 1125 (D.C. Cir.1981), where we examined the legislative history of the attorney appointment provision and found "its objective abundantly clear." *Id.* at 1128.

> Congress realized that many litigants pressing Title VII grievances would have but limited

financial resources and scant knowledge of the intricacies of legal procedure. In granting complainants the right to request counsel, and the courts discretionary authority to appoint counsel, Congress intended to mitigate this evident disadvantage.

*Id.* at 1128–29 (footnotes omitted).

**1184**

without the necessity of judicial involvement with the legal services market.

**B.**

■ With the foregoing principles in mind, we turn to the specific approach that should be followed under 42 U.S.C. § 2000e–5(f)(1) pursuant to a request for appointment of counsel. In *Hilliard*, we rejected the suggestion that courts have a duty to appoint attorneys *sua sponte. Hilliard v. Volcker*, 659 F.2d 1125, 1127–28 (D.C.Cir.1981). We adhere to that view and note initially that the court's obligation to consider appointment is triggered only if the plaintiff makes a clear request for invocation of the attorney appointment power. *See id.* at 1128 ("Title VII imposes a duty on the court to consider an appointment of counsel for a complainant but only upon his application ....") (footnote omitted); 42 U.S.C. § 2000e–5(f)(1) (1976) ("Upon application by the complainant ... the court may appoint an attorney").[20]

Once the plaintiff has triggered the attorney appointment provision, "courts must give serious consideration" to the plaintiff's request. *Jenkins v. Chemical Bank*, 721 F.2d 876, 879 (2d Cir.1983). *See also Hilliard*, 659 F.2d at 1128. To facilitate this consideration, the court should provide some guidance to the plaintiff regarding the factors that it may consider in acting on the motion and the showing that will be expected of the plaintiff.[21] The goal, of course, is to make a sound determination as to whether appointment is appropriate. Achievement of this goal is most likely if the relevant information is before the court.[22]

■ The trial court's decision on the request will be overturned only for abuse of discretion.[23] However, we reiterate that "such discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (quoting *United States v. Burr*, 25 F.Cas. 30, 35 (C.C.D.

---

**20.** Typically plaintiffs will have been notified of their right to request judicial appointment of counsel; this notice is either provided by the EEOC, *Hilliard*, 659 F.2d at 1130, or by the federal agencies employing them. *Id.* at 1132. We express no opinion as to the "triggering obligation" of plaintiffs when this notice has not been provided. *See id.* at 1133 (holding "that a litigant who, for unawareness of the court's power, fails to request counsel should not be penalized because the agency has been remiss in this duty").

**21.** *Cf. Hilliard*, 659 F.2d at 1129, 1131 (recognizing the broad "congressional expectation that Title VII claimants would be advised generally on their rights," since "complainants unaware of their rights obviously are incapable of asserting them") (footnote omitted); *Stebbins v. Keystone Ins. Co.*, 481 F.2d 501, 512 (D.C.Cir.1973) (Bazelon, C.J., concurring) ("We must be especially cautious not to place unwarranted roadblocks in the way of discrimination litigation which is commonly brought by indigent or pro se members of minority groups. To avoid this problem, the trial court could have given Stebbins a minimal amount of information about the consequences of his failure to contest the motion for summary judgment.") (footnote omitted); *id.* at 512–13 (Robinson, J., concurring) ("It simply cannot be assumed that an ordinary *pro se* litigant is conversant with the intricacies of collateral estoppel or summary judgment. That is

not to say that these wholesome doctrines are to be cast aside simply because the litigant is a layman. It is to say, however, that the presence of such a litigant may summon the court to the minor effort needed to make sure that they do not become traps for the legally unlearned.") (footnote omitted). *See generally Caston v. Sears, Roebuck & Co.*, 556 F.2d 1305, 1310 (5th Cir.1977) ("District courts should be sensitive to the problems faced by *pro se* litigants and innovative in their responses to them.").

**22.** In some cases it may be appropriate for the court to defer a decision on the plaintiff's motion while the plaintiff searches for representation. If this course of action is chosen, it may be useful for the court to offer some advice as to how the plaintiff might conduct this search and to request that the plaintiff report back to the court about the results of the search. Indeed, as a general matter it will make good sense for a trial court to offer such guidance in any Title VII case in which a *pro se* plaintiff appears and expresses a desire to be represented by counsel.

**23.** *Jenkins*, 721 F.2d at 879; *Bradshaw v. Zoological Soc'y*, 662 F.2d 1301, 1318 (9th Cir.1981); *White v. United States Pipe & Foundry Co.*, 646 F.2d 203, 205 (5th Cir.1981); *Spanos v. Penn Cent. Transp. Co.*, 470 F.2d 806, 808 (3d Cir.1972) (per curiam).

Va.1807) (No. 14,692) (Marshall, C.J.)).[24] Furthermore, in exercising this discretion, the court should clearly indicate its disposition of the request for appointment and its basis for that disposition.[25]

█ The "legal principles" that are relevant to the lower court's exercise of discretion have been articulated with substantial uniformity by the courts of appeals. Based on the analysis in these cases, and the history and purpose of Title VII and the appointment provision, we believe a. court ought to consider the following factors: (1) the ability of the plaintiff to afford an attorney; (2) the merits of the plaintiff's case; (3) the efforts of the plaintiff to secure counsel; and (4) the capacity of the plaintiff to present the case adequately without aid of counsel.[26] While these factors ordinarily should be considered by the trial court,[27] this list is not necessarily ex-

24. *Accord Jenkins,* 721 F.2d at 878; *Bradshaw,* 662 F.2d at 1318; *Caston,* 556 F.2d at 1308 ("Application of [the attorney appointment provision] necessarily demands the exercise of a broad discretion. Exercise of discretion, however, implies the application of a reasoned and well-informed judgment."). *See generally Franks v. Bowman Transp. Co.,* 424 U.S. 747, 770–71, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976) ("Discretion is vested not for purposes of 'limit[ing] appellate review of trial courts, or ... invit[ing] inconsistency and caprice,' but rather to allow the most complete achievement of the objectives of Title VII that is attainable under the facts and circumstances of the specific case.") (quoting *Albemarle Paper Co.,* 422 U.S. at 421, 95 S.Ct. at 2373).

25. *See Jenkins,* 721 F.2d at 880 (reversing and remanding district court's decision where "[o]n this record ... we cannot be assured the failure to assign counsel was grounded on a reasoned application of sound prescripts"); *Caston,* 556 F.2d at 1308 ("We find a remand necessary in this case because we are unable to conclude from the record that the district court exercised a reasoned and well-informed discretion which we may review."). *See generally United States v. Criden,* 648 F.2d 814, 819 (3d Cir.1981) ("the trial court's ... articulation of the reasons for the decision tends to provide a firm base for an appellate judgment that discretion was soundly exercised").

26. The relevance of the first three factors has been noted in almost every recent court of appeals decision addressing the "test" that is to be used in evaluating motions for appointment in Title VII cases. *Jenkins,* 721 F.2d at 880; *Brooks v. Central Bank,* 717 F.2d 1340, 1342 & n. 2 (11th Cir.1983) (per curiam); *Bradshaw,* 662 F.2d at 1318; *Jones v. WFYR Radio/RKO General,* 626 F.2d 576, 578 (7th Cir.1980) (per curiam) (endorsing these criteria as "suggested guidelines" but indicating that "the district court may employ whatever procedure it finds most useful to make an informed decision"), *overruled on other grounds, Randle v. Victor Welding Supply Co.,* 664 F.2d 1064 (7th Cir.1981) (holding that order denying motion for appointment of counsel is not immediately appealable); *Caston,* 556 F.2d at 1309. The fourth factor has been men-

tioned by a number of courts in Title VII cases, *Jenkins,* 721 F.2d at 880 ("Plaintiff's ability to gather and present crucial facts should be heeded, as should the complexity of the legal issues raised in the complaint."); *Hudak v. Curators of the Univ. of Missouri,* 586 F.2d 105, 106 (8th Cir.1978) (per curiam), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1799, 60 L.Ed.2d 247 (1979); *Barnell v. Paine Webber Jackson & Curtis Inc.,* 577 F.Supp. 976, 979 (S.D.N.Y.1984), and also in many cases involving the application of 28 U.S.C. § 1915(d) (1976). *E.g., Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 at 1005 (8th Cir.1984) (court should consider whether nature of litigation is such that counsel will benefit plaintiff); *Merritt v. Faulkner,* 697 F.2d 761, 764 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *Ulmer v. Chancellor,* 691 F.2d 209, 213 (5th Cir.1982).

In a very recent decision, the Eighth Circuit articulated a somewhat different approach in a case that "was treated in the court below as a Title VII action." *Nelson,* 728 F.2d at 1003. Relying on 28 U.S.C. § 1915(d) (1982), *see* note 18, *supra,* the court announced the following test:

> If a frivolous claim has been alleged, the district court may dismiss the claim. However, once the court is satisfied that plaintiff has alleged a valid prima facie claim, then further inquiry should be made as to need. The court should satisfy itself that plaintiff has in good faith attempted to retain counsel and has been unsuccessful. The court should also determine whether the nature of the litigation is such that plaintiff as well as the court will benefit from the assistance of counsel.

*Id.* at 1005.

27. Although we anticipate that these factors merit some consideration in most cases, we do not foreclose the possibility that a case might arise in which a district court could properly consider somewhat different factors. *Compare Bradshaw v. Zoological Soc'y,* 662 F.2d 1301, 1318 n. 43 (9th Cir.1981) ("The three factors listed in the text are applicable in all cases. They are usually the only relevant factors.") *with Caston v. Sears, Roebuck & Co.,* 556 F.2d·

clusive. *See, e.g., Jenkins v. Chemical Bank,* 721 F.2d 876, 880 (2d Cir.1983). If the particular facts of a case warrant consideration of additional factors, a court may do so as long "as they are treated in a manner consistent with the policy of the statutory provision." *Bradshaw v. Zoological Society,* 662 F.2d 1301, 1318 n. 48 (9th Cir.1981).

■ *The first factor,* i.e., plaintiff's ability to afford counsel, normally should serve as the starting point in the trial court's analysis, largely because the appointment provision is primarily intended to protect plaintiffs with limited economic means. In evaluating the plaintiff's ability to afford counsel, a court should not insist that a plaintiff be destitute,[28] nor should it demand as substantial a showing as that required to proceed *in forma pauperis.*[29] Given Congress' concern about the financial burden resulting from attorneys' fees, appointment surely should not be refused because of a plaintiff's income or assets if payment of fees would jeopardize the plaintiff's ability to maintain the necessities of life.[30]

■ If a court finds that a plaintiff *can* afford to hire counsel, this ordinarily will be a dispositive ground for denying the request for appointment. However, it is at least *conceivable* that even a plaintiff capable of paying an attorney, and asserting a meritorious claim, will be unable to secure representation.[31] If the plaintiff alleges as much, the remedial purposes of Title VII may compel the appointment of counsel. However, before doing so, a court would be wise to look with particular care at both the merits of the case and the diligence of the plaintiff's search for counsel.

■ *The second factor* that a court should consider is the merits of the plaintiff's case. If a suit has very little prospect of success, the benefit that attorney appointment provides the plaintiff may be offset by the burden of litigation on the judiciary and the defendant, as well as on

1305, 1308 (5th Cir.1977) ("We quickly point out that the suggestions which we make are designed to assist the decision-maker and not to control the decision. In addition, the considerations which we deem relevant are merely suggestive rather than exhaustive."). If a court chooses to do so, it should pay heed to the Fifth Circuit's suggestion that "[d]istrict courts should be sensitive to the problems faced by *pro se* litigants and innovative in their responses to them." *Id.* at 1310. Additionally, as we explain *infra,* there will also be cases in which an analysis of one of the factors we have enumerated will be dispositive, obviating the need for consideration of the other factors.

**28.** *Jenkins,* 721 F.2d at 880; *Caston,* 556 F.2d at 1309; *Petete v. Consolidated Freightways,* 313 F.Supp. 1271, 1272 (N.D.Tex.1970).

**29.** *E.g., Ivey v. Board of Regents,* 673 F.2d 266, 269 (9th Cir.1982); *Bradshaw,* 662 F.2d at 1319; *Application of Miller,* 427 F.Supp. 896, 898 (W.D. Tex.1977).

**30.** Of course in all likelihood requiring such plaintiffs to forego necessities in order to bring suit would simply force them not to litigate their claims. Such a result would contravene Congress' intention to use private litigation as the vehicle for enforcement of Title VII. For cases following an approach similar to that adopted here, see *Luna v. International Ass'n of*

*Machinists & Aerospace Workers Local #36,* 614 F.2d 529, 531 (5th Cir.1980) (appointment appropriate where plaintiff "had insufficient financial ability to retain a lawyer. His retirement income of $534 per month, plus his meager assets, could not allow him to support his family of six and to hire counsel for this litigation."); *Edmonds v. E.I. duPont deNemours & Co.,* 315 F.Supp. 523, 524–25 (D.Kan.1970) (appointing counsel where plaintiff "was not financially able with her limited means and small income to employ counsel"; plaintiff was "not a pauper" but "her income and means scarcely provided her with actual necessities"); *Petete v. Consolidated Freightways,* 313 F.Supp. 1271, 1271 (N.D.Tex.1970) (appointing counsel where plaintiff submitted affidavit stating that "while not a pauper, she was without funds sufficient to both hire an attorney and to continue to provide herself with the bare necessities of life").

**31.** *See Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305, 1309–10 (5th Cir.1977) ("We are not unmindful of the fact that in some areas, either because of unpopularity or unfamiliarity, a particular plaintiff may be unable to locate an attorney who is willing to prosecute even a meritorious claim.... While we could perhaps envision a case in which even a rich man could not obtain legal counsel, we believe that such a case would indeed be rare.").

the appointed attorney.[32] At the same time, the absence of an attorney for the plaintiff may make it difficult for the court to evaluate the merits of the plaintiff's claim in deciding whether appointment is appropriate. The balancing of these considerations is problematic. Finding no satisfactory guidance in the case law or in the language and history of the appointment provision, we will not attempt to articulate a standard that greatly circumscribes the trial court's discretion. We will, however, indicate at least the range within which the court's discretion should be exercised: if the plaintiff's claim appears to be patently frivolous, appointment should be refused; [33] if, on the other hand, the plaintiff appears to have some chance of prevailing, then appointment should not be refused for want of a meritorious claim.[34]

■ In determining the merits of the plaintiff's claim, the trial court should consider the information before it and, if necessary, make further inquiries of the parties.[35] Often the district court will have before it the EEOC's determination of whether the plaintiff's claim is reasonable. If the EEOC has found that there was reasonable cause to believe that plaintiff was the victim of discrimination, this finding establishes a strong but rebuttable presumption that the plaintiff's case has sufficient merit to justify appointment of counsel.[36] However, "an EEOC determination that no reasonable cause supports the plaintiff's claim should be approached

---

**32.** See *Spears v. United States,* 266 F.Supp. 22 (S.D.W.Va.1967), where, in applying the appointment provision in 28 U.S.C. § 1915(d) (1982), the court indicated:

The general rule seems to be that, before the Court is justified in exercising its discretion in favor of appointment, it must first appear that the claim has some merit in fact and law.... Were it otherwise, the appointment in most instances would work a hardship on counsel with no concomitant benefit to the party requesting it.

*Id.* at 25–26 (citations omitted).

**33.** *E.g., Application of Miller,* 427 F.Supp. 896, 898 (W.D.Tex.1977) (appointment of counsel in suit against employer would be "inappropriate, since there has been no showing that such a suit would be other than frivolous"). See also the cases cited in note 34, *infra,* indicating that a case is sufficiently meritorious *if* it is not frivolous.

**34.** The test that we have enunciated merely marks the boundaries for the exercise of judicial discretion. It should be noted that in a number of cases, courts have indicated that appointment may be appropriate where a somewhat lesser standard is satisfied. *See Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 at 1005 (8th Cir.1984) ("once the court is satisfied that plaintiff has alleged a valid prima facie claim, then further inquiry should be made as to need") (applying 28 U.S.C. § 1915(d) (1982) in a Title VII case); *Jones v. WFYR Radio/RKO General,* 626 F.2d 576, 578 (7th Cir.1980) (per curiam) (appointing counsel where, *inter alia,* "[t]he record before us reveals that Jones sufficiently alleged a race discrimination claim"), *overruled on other grounds, Randle v. Victor Welding Supply Co.,* 664 F.2d 1064 (7th Cir.1981); *Application of Miller,* 427 F.Supp. 896, 898 (W.D.Tex.

1977) (appointing counsel in suit against union where appointment was "not inappropriate ... because of obvious lack of merit"); *Petete v. Consolidated Freightways,* 313 F.Supp. 1271, 1272 (N.D.Tex.1970) (appointing counsel where, *inter alia,* "plaintiff's complaint does not appear to be frivolous").

**35.** *See Jones v. WFYR Radio/RKO General,* 626 F.2d 576, 577 (7th Cir.1980) (per curiam) ("[T]he district court should make some appraisal of the merits of plaintiff's claim. The court's examination need not be detailed, nor must the court construct an extensive record for review. Perhaps the court should conduct a brief oral examination of the plaintiff and review the EEOC record."), *overruled on other grounds, Randle v. Victor Welding Supply Co.,* 664 F.2d 1064 (7th Cir.1981). However, the court need not, and should not, go so far as to actually decide the merits of the case prior to a decision on the plaintiff's request for appointment of an attorney.

**36.** As the Ninth Circuit explained in *Bradshaw:*

Where the administrative agency charged with enforcing the statute has made a determination that there is reasonable cause to believe that the plaintiff was the victim of discrimination, ... the court need ordinarily make no further inquiry for purposes of appointment of counsel. The EEOC determination is, of course, subject to rebuttal by the defendants, but only to a very limited extent.

662 F.2d at 1320 (footnote omitted). We adopt the Ninth Circuit's view that this strong presumption may be rebutted only if " 'the administrative finding is unsustainable on its face, is internally inconsistent, or is flawed in its legal reasoning.' " *Id.* at 1309 n. 20 (quoting EEOC).

somewhat differently, for the reason that the plaintiff will be without the aid of counsel in challenging the agency's finding." *Bradshaw v. Zoological Society*, 662 F.2d 1301, 1309 n. 20 (9th Cir.1981). Such a determination, standing alone, is not a sufficient basis for denying appointment of counsel. *Neal v. IAM Local Lodge 2386*, 722 F.2d 247, 250 (5th Cir.1984); *Jenkins v. Chemical Bank*, 721 F.2d 876, 880 (2d Cir. 1983); *Jones v. WFYR Radio/RKO General*, 626 F.2d 576, 577 (7th Cir.1980) (per curiam), *overruled on other grounds*, *Randle v. Victor Welding Supply Co.*, 664 F.2d 1064 (7th Cir.1981); *Caston*, 556 F.2d at 1308; *Harris v. Walgreen's Distribution Center*, 456 F.2d 588, 590 (6th Cir. 1972). However, "a finding that the EEOC determination is *supported by substantial evidence* in the investigative file *and* that plaintiff's objections thereto are *patently frivolous* would weigh heavily in the scales against appointing an attorney." *Caston*, 556 F.2d at 1309 (emphasis added).[37]

■ *The third factor* to be considered is the plaintiff's diligence in searching for counsel.[38] While the plaintiff's showing of diligence requires more than "pass[ing] the

matter over with . . . casual comment," *Arnold v. Speedgrip Chuck, Inc.*, 524 F.Supp. 679, 682 (N.D.Ind.1981), the plaintiff need not "exhaust the legal directory before a court could appoint him an attorney." *Caston*, 556 F.2d at 1309. In each case, the question is whether the plaintiff has made "what can be considered a reasonably diligent effort under the circumstances to obtain counsel." *Bradshaw*, 662 F.2d at 1319.[39] The court might consider "the availability of counsel in its geographical area and the plaintiff's possible skill or lack of skill at obtaining such help[,] the number of contacts with potential counsel," *Jenkins*, 721 F.2d at 880, as well as other factors relevant to the burden that a more exhaustive search would impose on the plaintiff.

■ Finally, a court ought to consider the plaintiff's ability to present the case adequately. As a general matter, it should be recognized that plaintiffs usually will be seriously disadvantaged if they must proceed *pro se* and, therefore, trial courts should be aware that refusing to appoint counsel may be tantamount to denying them a day in court.[40] However, cases

**37.** *Accord Bradshaw*, 662 F.2d at 1309 n. 20; *cf. Jenkins*, 721 F.2d at 880 ("a negative EEOC determination, together with patently frivolous rebuttals by the plaintiff, would militate against appointment of a lawyer"); *Jones*, 626 F.2d at 577 ("Certainly, if the court finds that the EEOC's determination is supported by substantial evidence and that the plaintiff's objections to the determination are insubstantial, it may accord the Commission's findings weight.").

**38.** *Compare Bradshaw*, 662 F.2d at 1319 (plaintiff had made sufficient search where she "contacted more than ten attorneys, each of whom declined to represent her except upon financial terms that she was unable to meet"); *Luna v. International Ass'n of Machinists & Aerospace Workers Local #36*, 614 F.2d 529, 531 (5th Cir. 1980) (where plaintiff filed affidavit indicating that he had contacted four attorneys and listing the reasons each attorney refused to take the case, court concluded that he had made "repeated, diligent attempts to obtain counsel"); *and Application of Miller*, 427 F.Supp. 896, 899 (W.D.Tex.1977) (plaintiff was entitled to appointment of attorney where plaintiff's statement indicated that "he contacted three lawyers, as well as Legal Aid and the Bar Association, all to no avail") *with Spanos v. Penn. Cent. Transp.*

*Co.*, 470 F.2d 806, 808 (3d Cir.1972) (per curiam) ("Although [the plaintiff] had nearly thirty days in which to [enlist the aid of counsel] he passed the matter over with the casual comment that he 'did not have the time or the means available within the 30-day time limit . . . to seek out an attorney.' Considering the fact he was unemployed during the time in question, he cannot justifiably impose this duty upon the court.") (footnote omitted) *and McIntyre v. Michelin Tire Corp.*, 464 F.Supp. 1005, 1009–10 (D.S.C.1978) (refusing to appoint counsel where plaintiff claimed to have sought representation from only two attorneys).

**39.** *Accord Jenkins*, 721 F.2d at 880; *cf. Nelson v. Redfield Lithograph Printing*, 728 F.2d 1003 at 1005 (8th Cir.1984) ("The court should satisfy itself that plaintiff has in good faith attempted to retain counsel and has been unsuccessful."); *Barnell v. Paine Webber Jackson & Curtis Inc.*, 577 F.Supp. 976, 978 (S.D.N.Y.1984) (factor to be weighed is whether plaintiff has made "substantial independent effort to obtain counsel").

**40.** *See, e.g., Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir.1981) (per curiam) ("Where the indigent is in no position to investigate crucial facts, counsel should often be appointed.") (28 U.S.C.

may arise in which the plaintiff's background and demonstrated skills suggest that appointment of counsel is unnecessary.[41] These considerations are certainly pertinent to the court's disposition of the request for appointment.

Also relevant to this analysis is the degree to which lawyering skills will be required in any particular case. For example, if a case will involve conflicting or complex testimony,[42] or difficult legal issues,[43] representation by counsel may be essential. On the other hand, appointment may be inappropriate "where the factual issues are uncomplicated or insubstantial" and the law is "so clearly settled that appointment would serve no purpose." *Maclin v. Freake*, 650 F.2d 885, 888–89 (7th Cir.1981) (per curiam).

In discussing the preceding four factors at some length, we have attempted to guide the district courts' exercise of discretion and to indicate the outer limits of that discretion. These limits leave district courts with substantial latitude in evaluating each factor and determining the relative weight of the factors. By clearly explicating the boundaries of this discretion, we mean to insure that the trial level is where the decision to appoint will be made.[44] We also mean to highlight the significance of the attorney appointment provision in Title VII so that trial judges will give proper attention to requests for appointment.[45]

## C.

We turn now to the facts of the case before us. In considering these facts it should be recognized at the outset that the trial judge considered the appellant's request for appointment without the benefit of clearly prescribed standards in this Circuit. In our view, the District Court's pro-

§ 1915(d) (1982)); *Luna*, 614 F.2d at 531 ("the district judge should have displayed more sensitivity and flexibility in dealing with someone as ill-suited for managing a *pro se* suit as Luna, an industrial worker with only a limited ability to speak English"); *Drone v. Hutto*, 565 F.2d 543, 544–45 (8th Cir.1977) (per curiam) (ordering district court to reconsider failure to appoint counsel where record disclosed that plaintiff might suffer from mental disease) (28 U.S.C. § 1915(d) (1982)).

**41.** *E.g., Hudak v. Curators of the University of Missouri*, 586 F.2d 105, 106 (8th Cir.1978) (per curiam) (Plaintiff "is a lawyer and a former professor of law, with an advanced legal degree.... [H]er control over the details of the litigation thus far indicates that she is able to represent herself.").

**42.** *See, e.g., Maclin v. Freake*, 650 F.2d 885, 888 (7th Cir.1981) (per curiam) (In cases "where the only evidence presented to the factfinder consists of conflicting testimony ... it is more likely that the truth will be exposed where both sides are represented by those trained in the presentation of evidence and in cross examination.") (28 U.S.C. § 1915(d) (1982)); *Barnell v. Paine Webber Jackson & Curtis Inc.*, 577 F.Supp. 976, 979 (S.D.N.Y.1984) (appointing counsel where plaintiff's mental incapacity was at issue; court explained that absent representation, "plaintiff would have to master the complex task of preparing and examining experts" and would have to examine herself about her incapacity).

**43.** *E.g., Jenkins*, 721 F.2d at 880; *Merritt v. Faulkner*, 697 F.2d 761, 764 (7th Cir.1983) (28 U.S.C. § 1915(d) (1982)), *cert. denied*, —— U.S. ——, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

**44.** Neither district courts nor the judicial system as a whole are well served by the failure of appellate courts to articulate as clearly as possible what will be expected of the district court. In this vein, we take note of the substantial number of recent cases in which an appellate court has been compelled to reverse a district court's failure to appoint counsel, *see Bradshaw v. Zoological Soc'y*, 662 F.2d 1301 (9th Cir.1981); *Jones v. WFYR Radio/RKO General*, 626 F.2d 576 (7th Cir.1980) (per curiam), *overruled, Randle v. Victor Welding Supply Co.*, 664 F.2d 1064 (7th Cir.1981); *Luna v. International Ass'n of Machinists & Aerospace Workers Local #36*, 614 F.2d 529 (5th Cir.1980), or to remand for reconsideration on this issue. *See Neal v. IAM Local Lodge 2386*, 722 F.2d 247 (5th Cir.1984); *Jenkins v. Chemical Bank*, 721 F.2d 876 (2d Cir.1983); *Caston v. Sears, Roebuck & Co.*, 556 F.2d 1305 (5th Cir.1977).

**45.** As we have already noted, the legislative history of the Civil Rights Act unmistakably evidences "[c]ongressional recognition of the importance of the appointment of counsel provision." *Bradshaw*, 662 F.2d at 1316. Therefore, trial courts can ill-afford to be "parsimonious in Title VII suits" when considering requests for appointment of counsel. *Flowers v. Turbine Support Div.*, 507 F.2d 1242, 1244 n. 2 (5th Cir.1975).

ceedings reflect both sensitivity to the problems of a *pro se* plaintiff and the trial judge's diligent efforts to secure counsel for the appellant. Nevertheless, it is apparent that the court's treatment of the appellant's motion deviates from the standards we articulate today in important respects. Because these departures may have prejudiced the appellant's right to request counsel, this case must be remanded to the District Court for further proceedings.

■■■ The record reveals that the court originally did appoint counsel for the appellant. We do not know its basis for doing so or whether any showing was required of the appellant. The appointed attorney then withdrew from the case and the court made further efforts to secure counsel for the appellant. On September 17, 1981, after its efforts proved unavailing, the court convened the parties, apparently to discuss further steps that the appellant might take to find counsel. The court did not expressly deny the appellant's motion for appointment or indicate its reasons for doing so. The court's discussion did, however, clearly imply that the additional steps needed to secure counsel were to be undertaken by the appellant. Nothing in the record suggests that the court attempted to secure counsel, or considered appointment, after the September 17 status call.

On this record, no meaningful judgments can be made by this court about whether counsel should have been appointed. Certainly nothing in the record at the time counsel was requested permits an adequate evaluation of three of the four factors we have enumerated: the merits of the case, the diligence of the appellant's search for counsel, and the capacity of the appellant to present the case adequately. The record also contains no information relating to the appellant's assets, expenses or liabilities. Although it does suggest that the appellant could afford counsel *prior to his dismissal*

on September 24, it also suggests that he could not afford counsel for a significant period after his dismissal.

■■■ The lower court's decision cannot be sustained solely on the basis of our assumptions about appellant's income prior to September 24. For even if appointment should have been denied prior to that date, the appellant might have again moved for appointment following his dismissal.[46] Hence, the failure to appoint counsel can only be sustained on this record if we conclude that the appellant's failure to repeat his motion should cause us to disregard the possibility that appointment might have been appropriate as of September 24.

On the facts of this case, insisting on such action by the appellant would be unjust and inconsistent with the remedial purposes of Title VII. As a procedural matter, we have grave doubts about the proposition that a *pro se* plaintiff should be required to repeat an earlier motion, especially when the court has not formally decided the earlier motion. Had the court explicitly decided the motion here, it could easily have explained to the appellant the reasons for its decision and his right to renew his request if circumstances changed. Instead, since the court simply indicated that it had done its best, the appellant might reasonably have concluded that any further requests for appointment would be futile.

Additionally, it appears from the record here that the court had reasons to know of the changes in the appellant's financial position. As we have delineated, all parties, including the trial judge, understood the precariousness of the appellant's continued employment. Moreover, the appellant expressly reported his dismissal, and subsequent inability to find counsel, at the November 20 status call.

■■■ In a perfect world, the trial judge might have given more explicit advice to the appellant concerning its appointment power, and the appellant might have

**46.** *See Neal v. IAM Local Lodge 2386,* 722 F.2d 247, 248–49 (5th Cir.1984) (holding that where plaintiff renewed request for appointment after original application was denied, and record indicated that plaintiff's economic situation had changed, case should be remanded so District Court could reconsider plaintiff's request "in light of current circumstances").

promptly informed the court of the changes in his economic situation. In this case, however, we must review the good faith efforts of a trial judge acting without clearly prescribed standards and the responses of a *pro se* plaintiff with little understanding of the workings of the judicial system. Mindful of both the policies underlying Title VII's appointment power and the need to "be sensitive to the problems faced by *pro se* litigants," [47] we conclude that the appellant should be given an opportunity to prove that appointment of counsel was appropriate after he was dismissed by the appellee.[48] Accordingly, we reverse and remand the District Court's decision.[49]

### D.

The steps that should be taken by the District Court on remand are as follows:

(1) The court should determine whether appointment of an attorney for the appellant would have been warranted after his dismissal on September 24, 1981. We have delineated the criteria that should be considered in making this determination in Part B *supra*. The court's determination should be based on the evidence in the record after the time of appellant's dismissal, supplemented by any additional evidence the parties can provide that is relevant to this time period. Because "[t]he question of appointment of an attorney is a preliminary inquiry [it] should not be based upon the evidence adduced at trial." *Jenkins v. Chemical Bank*, 721 F.2d 876, 880 (2d Cir.1983). If the court decides that appointment was unwarranted, the court need not complete the additional steps prescribed *infra* and may enter judgment for the appellee.

(2) If the court determines that appointment was warranted, further proceedings are necessary. Before scheduling such proceedings, the court should determine whether the appellant *presently* requires appointed counsel. This determination should be based on the criteria we have enumerated, as applied to the appellant's situation at the time this case is heard on remand. If appointment of counsel is presently warranted, the court should adhere to the mandate of the statute; [50] if appoint-

---

**47.** *Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305, 1310 (5th Cir.1977).

**48.** *Cf. Luna v. International Ass'n of Machinists & Aerospace Workers Local #36,* 614 F.2d 529, 531–32 (5th Cir.1980) ("Luna's failure to satisfy procedural rules and to submit the amended complaint was caused at least in part by the judge's erroneous decision not to appoint counsel for him. Luna's failure to appear in a timely manner for trial shows only his confusion or negligence, not a clear record or delay or contumacious conduct. We conclude that the district judge abused his discretion when he dismissed Luna's complaint with prejudice.") (citation omitted).

**49.** The appellant's receipt of 13 unemployment compensation checks, and subsequent unsuccessful effort to hire an attorney, does not dictate a different decision. Absent a finding by the lower court that the appellant was not indigent at this time, or sufficient evidence in the record regarding the appellant's assets, income and expenses, we will not hold that an appellant's willingness to expend his unemployment compensation in an effort to vindicate his claims, standing alone, justifies denying appointment of an attorney. This conclusion is particularly warranted in this case because the appellant received his unemployment compen-

sation more than five months after requesting appointment of counsel. The only pertinent evidence in the record indicates that his subsequent attempt to hire counsel was unsuccessful because the attorney believed that the advanced stage of the proceedings left her insufficient time to represent the appellant adequately. Transcript of March 2; 1982 Status Call at 4 (March 2, 1982), *reprinted in* App. 48.

**50.** Because the lower court has yet to make a determination of whether appointment was justified following the appellant's dismissal, we do not decide what action the court may be required to take if it determines this in favor of the appellant. Specifically, we express no view as to whether a court that has found appointment to be justified may decline to appoint counsel because of its lack of success in locating willing counsel, or as to whether the court is empowered to compel representation. Because these questions have not been adequately briefed, and because on this record we cannot even discern whether appointment is justified, these issues are best left to another day.

We do note, however, our strong expectation that members of the local bar will be responsive to judicial requests for representation of claimants in Title VII cases, thereby mooting any

ment is unwarranted at this time, the appellant should secure counsel on his own.

(3) If the court determines pursuant to step one that appointment would have been warranted after the appellant's dismissal, the applicant should be "afforded a hearing at which the appellant, or his counsel, might present evidence justifying further proceedings. The district court would then have a firm basis for making a fair determination whether any prejudice resulted from the earlier failure to appoint an attorney. For in the absence of such a showing, judicial resources need not be wasted on duplicative litigation." *Jenkins,* 721 F.2d at 880–81.

### CONCLUSION

For the foregoing reasons, the decision of the District Court is reversed and remanded for further proceedings.

*So ordered.*

SCALIA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's analysis of the requirements of 42 U.S.C. § 2000e–5(f)(1) (1976). I dissent because I believe the record fails to show what I believe to be the prerequisite for invocation of those requirements: an application by the complainant based upon an asserted reason that the statute permits ("I am too poor" or "My cause is too unpopular"). It may even be that upon application without any stated reason the court must inquire as to what the reason might be. That was done here on September 17. (The Court: "Would you mind ... stating why you have been unable to [get counsel]? Has it been financial?" Mr. Poindexter: "No.") At that point, it

seems to me, the court's obligation was clearly at an end. I reject the notion that the plaintiff's statement immediately before this exchange ("I think I could manage [to pay counsel] providing I can keep my job") amounted to some sort of springing averment of impecuniousness that took effect when he was dismissed. It is unreasonable to demand that when the district judge next spoke to the appellant—more than two months later, on November 20, after he had lost his job—she have had this negative pregnant in mind. Moreover, even if the previous (and, in all likelihood, forgotten) condition ripened into an averment of impecuniousness when he was dismissed, surely that averment was effectively cancelled when he later advised the court that—unemployed though he was—he had hired counsel, at an agreed-upon retainer of $1,300, $800 of which had been paid.

Nor would the circumstances have put the court on notice that this litigant could not afford counsel. The plaintiff was neither uneducated nor long unemployed. He had held a steady job at the FBI for seven years, during the last four and a half years at a clerical level. On leaving the government he had withdrawn his accumulated contributions to the retirement fund; and he was entitled to unemployment compensation, apparently in the amount of $196 per week. He claimed to have experienced financial difficulty making it impossible for him to take depositions before January 5, 1982, when his first unemployment checks arrived (though he spent $232 to go by plane to his home town during this period). But this temporary impecuniousness was not brought to the court's attention until February 10, in explanation of the plain-

---

issues of the sort here mentioned. See *Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 at 1005 (8th Cir.1984), where the Eighth Circuit observed that "[t]here has been reluctance by some judges to request lawyers to appear in pro bono litigation. We disapprove of such reluctance." Quoting its earlier statement in *Peterson v. Nadler,* 452 F.2d 754, 758 (8th Cir.1971), the court indicated:

> Lawyers have long served in state and federal practice as appointed counsel for indigents in both criminal and civil cases. The

vast majority of the bar have viewed such appointments to be integrally within their professional duty to provide public service. Only rarely are lawyers asked to serve in civil matters. We have the utmost confidence that lawyers will always be found who will fully cooperate in rendering the indigent equal justice at the bar.

*Id. Accord Caruth v. Pinkney,* 683 F.2d 1044, 1049 (7th Cir.1982) (per curiam), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983).

tiff's request to extend discovery time *since only now was he financially able to proceed.* By this time he had already offered a lawyer a $1,300 retainer, and three weeks later was prepared to go ahead with five depositions at a cost of at least $300 apiece. At no time, therefore, did the court have reason to believe that the plaintiff was currently impecunious.

It appears to me from this record that the district judge went well beyond any requirement of law in attempting to help out a plaintiff who *never* claimed impecuniousness, who had every appearance of solvency, and whose main problem seemed to be the legal unattractiveness of his case. The portions of the majority opinion dealing with the requirements of 42 U.S.C. § 2000e–5(f)(1) will be of great benefit to our district judges; the portion dealing with its application here will teach them only one unhappy lesson: never be a volunteer.